*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 05-84-P-S* |
| | ) | |
| *RASHAUN JONES,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Rashaun Jones, charged with conspiracy to distribute and possess with intent to distribute controlled substances, including one kilogram or more of a mixture or substance containing heroin and a mixture or substance containing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846, *see* Superseding Indictment (Docket No. 23), seeks to suppress from use as evidence at trial any items obtained from Room 318 of the TownePlace Suites in Scarborough, Maine on December 29, 2005 and at any time thereafter. *See* Motion To Suppress Evidence, etc. ("Motion To Suppress") (Docket No. 40) at 1. An evidentiary hearing was held before me on March 17 and 20, 2006 at which the defendant appeared with counsel. Immediately following the close of evidence, counsel were afforded the opportunity to argue orally. I now recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

**I. Proposed Findings of Fact**

On the afternoon of December 29, 2005 Sergeant John O'Malley of the Scarborough Police Department phoned Angela Henry, manager of the TownePlace Suites in Scarborough, Maine ("Hotel"), to discuss drug-trafficking suspects. Henry said the suspects about whom O'Malley had inquired had not checked into the Hotel; however, she relayed that an individual who had checked in,

Rashaun Jones, had raised her suspicions. She told O'Malley that Jones, who had arrived by taxi, had asked to stay for three weeks and, when she quoted him a rate of $89 per night, did not attempt to negotiate a lower price as people typically do who are staying a length of time. She also informed O'Malley that Jones had told her he needed to go to an ATM to obtain cash to pay for the room, but when he returned he produced crumpled $100 bills – not the crisp kind one would expect someone to have received from an ATM. Henry, who gave O'Malley Jones' date of birth, said Jones was staying in Room 318 of the Hotel with a roommate, Christopher Carpenter.

As O'Malley was conversing with Henry, he ran a check on Jones through the NCIC database. He learned that there was an outstanding warrant for the arrest of Rashaun Jones on drug charges and that Jones was believed to be armed and dangerous. O'Malley passed this information on to Henry and told her that he would immediately call the United States Marshals Service ("USMS"), which had responsibility for apprehending the subject of the warrant. He did so, reaching the USMS in Arlington, Virginia, which directed him to contact the USMS in Portland, Maine. He then called the USMS in Portland, reaching Deputy U.S. Marshal William Marr. Marr told O'Malley that he would put an arrest team together as quickly as possible. As O'Malley was speaking with Marr, he recognized an alias of "Smoke" on the arrest warrant and recalled that he had previously been informed that agents of the High Intensity Drug Trafficking Area ("HIDTA") Task Force had been looking for someone by that name. O'Malley relayed this to Marr, assuring Marr that he would next contact HIDTA. O'Malley then phoned two HIDTA members, United States Drug Enforcement Agency ("DEA") agents Steven Thibodeau and Paul Wolf. Wolf, who had participated in the investigation of cocaine and heroin trafficking that had led to issuance of the warrant for the defendant's arrest, asked O'Malley to meet him at the Hotel. O'Malley did so, arriving approximately thirty-five minutes after he had first spoken to Henry.

The two officers[1] went to see Henry, who told them that she thought Jones was in the room and provided Wolf passkeys to both Room 318 and an adjacent room, Room 317.  Henry also showed them a photocopy of Jones' driver's license.  Although Wolf had previously seen photographs of Jones, he had not committed his image to memory and could not positively identify him based on the poor-quality photocopy.  Nonetheless, Wolf thought the person depicted on the photocopied license appeared similar to the defendant, to the extent he could remember the details of photographs he had previously seen of him.  Wolf, who was serving that day as acting DEA supervisor, directed O'Malley to maintain surveillance from Room 317 while Wolf stationed himself in his vehicle at a nearby Shaw's supermarket parking lot to coordinate and await the arrival of backup USMS and DEA officers.  Wolf had been in touch directly with the USMS and had called upon several DEA agents to assist the marshals, as the agencies often did for each other.  The plan was for officers to converge in the parking lot of an adjacent business and enter the Hotel through a back door to avoid detection by the occupants of Room 318, who had a clear view of the Hotel's front office and parking lot.

As O'Malley watched the door of Room 318 through a peephole, he heard muffled conversations of its occupants.[2]  As best he could tell, there were at least two males and one female in the room.  Shortly after O'Malley set up surveillance, at about 2 p.m., he observed a black male, with the hood of his jacket up so that O'Malley could not see his face, exit Room 318 and go down the hallway.  From the windows of Room 317, which overlooked the Hotel parking lot, O'Malley observed the male exit the building and get into a vehicle parked almost directly beneath O'Malley's window.  A female driver, who also had her hood up, then departed the parking lot.

---

[1] I use the term "officers" generically to refer to all law-enforcement officers who participated in the arrest of the defendant at the Hotel, including drug-enforcement agents, United States marshals and local police.

[2] The doors of Rooms 317 and 318 are catty-cornered to one another.  *See* Gov't Exh. 2A.

O'Malley radioed this information to Wolf, who quickly caught sight of the vehicle and followed it to a Sam's Club parking lot. Although traffic was heavy and it was raining, Wolf was able to keep the vehicle in nearly continuous sight. The vehicle circled around in the Sam's Club parking lot without stopping, then headed back to the Hotel. No one was observed entering or exiting the vehicle during its short trip. O'Malley, who was kept apprised of these developments by radio, saw the vehicle return to the parking lot and pull into the same slot. The male exited and returned to Room 318 approximately ten to fifteen minutes after he had left. Through the wall, O'Malley heard a male voice loudly and happily counting from one to eight in what O'Malley took to be a celebratory fashion. The male voice repeated this loud, happy counting (which O'Malley assumed was of bills) several times over the course of the next half hour. Wolf and O'Malley both concluded, based on their training and experience, that the sequence of events, including the seeming trip to nowhere and the jubilant counting, was consistent with the consummation of a drug transaction, although Wolf acknowledged that it could be many other things.

Officers soon began to converge in the parking lot of an adjacent business near the Hotel. In addition to Thibodeau and Marr, they included DEA task-force agents Gregory Boucher and Stephen Welsh, Chief Deputy U.S. Marshal John Cooper and USMS Inspector Thomas Folan. Wolf briefed Cooper and Folan, advising that Jones, to whom Room 318 was registered, was believed to possess a weapon and was actively engaging in drug transactions in the southern Maine area.[3] Wolf then joined O'Malley in Room 317. Members of the arrest team continued to arrive, waiting in the parking lot of the adjacent business.

After Wolf joined him in Room 317, O'Malley observed a black male and a white female exit Room 318, leave the Hotel, get into a vehicle and drive in the direction of the nearby Shaw's parking

---

[3] While Wolf did not have an eyewitness report that the defendant possessed a weapon, he had participated in, or reviewed reports of, (*continued on next page*)

lot. Wolf relayed this information to arrest-team members waiting outside, directing that they stop the vehicle and identify its occupants, one of whom might be Jones.

Officers in two separate vehicles – among them, Marr and Cooper – followed the vehicle, which stopped in the nearby Shaw's parking lot. The black male got out, went into Shaw's and returned about five minutes later. Officers then detained both of the vehicle's occupants, placing the female driver in a Scarborough police car and the male passenger in a USMS car for questioning. Marr began questioning the passenger, who at first said that only one person, a relative of his, was back in Room 318. The passenger eventually confessed to Marr that Rashaun Jones was in the room. Marr relayed this to Cooper, who himself confirmed this with the passenger. Cooper asked the passenger if the room contained any weapons, and the passenger said he did not know. The passenger told Cooper that the purpose of his trip had been to get cigarettes for the other occupants of the room and that he was expected back shortly. As soon as the passenger was detained, his cell phone began ringing, and it continued to ring approximately every two minutes thereafter. Thibodeau took custody of the cell phone, which the passenger was not permitted to answer. Officers suspected that people in Room 318 were phoning the passenger, anxious to obtain the cigarettes.

Wolf and Cooper, who had been in constant contact, decided that the time had come to enter Room 318. Both were very concerned that the failure of the passenger to return with the cigarettes or answer his persistently ringing cell phone could alert occupants of Room 318 that something was amiss. Cooper, whose focus was on safety, was worried that this could lead the occupants of the room to arm themselves or otherwise prepare to resist arrest. Wolf likewise was concerned about safety – fearing that if the occupants became suspicious they might have time to attempt to evade capture or fight back, with resultant injury to themselves, officers or innocent bystanders. Wolf also was worried

---

interviews of witnesses and cooperating sources who had expressed great concern about the danger the defendant posed to them.

that, if the occupants became suspicious, they would succumb to the temptation to destroy drug-trafficking evidence – anything from ledgers to the drugs themselves.

Some members of the arrest team were summoned to a staging area in a second-floor room of the Hotel just below Room 318, using a back door to avoid detection, while others joined O'Malley in Room 317.  Use of the second-floor room as a staging area permitted those present to familiarize themselves with the layout of Room 318 – a suite consisting of two separate bedrooms (each with its own door) and a common area containing a kitchen, living room and bathroom.  *See* Gov't Exhs. 2B, 2C & 2D (views of interior of Room 318).[4]  Wolf, Cooper and four others, comprising a six-person entry team, convened on the second floor.  Cooper warned those present that Jones, the subject of the arrest warrant, potentially was armed and that entry needed to be made in an exigent fashion because cell-phone calls were being placed to the detained passenger, and Cooper did not want to give the occupants of Room 318 an opportunity to arm themselves or otherwise resist arrest.  The group quickly devised an operational plan.  The six-member team would enter first, preferably by using the passkey, but with a battering ram if necessary.  Wolf planned to enter first, carrying a ballistic shield, to provide cover for those behind him.  As the six-member team entered, those in Room 317 (approximately four or five additional officers) would swiftly follow behind.

As planned, the six-member team swiftly ascended the stairs to the hallway outside of Room 318, in "snake," or "stack," formation.  Thibodeau swiped the passkey, opened the door and stood aside to permit Wolf to enter.  The entire group then rapidly entered Room 318 with weapons drawn, shouting, "Police!  Police!"  The four or five officers who had been standing by in Room 317 (among

---

[4] Both the kitchen and living room are visible as one enters the common area of Room 318 from the hallway.  *See* Gov't Exh. 2D.  The kitchen is separated from the living room by a partially full and partially half wall.  *See id.*  As one enters from the hallway, the bathroom is on one's right, the living room is in the center and the kitchen is on one's left.  *See* Gov't Exhs. 2B & 2D.  The doors of the two bedrooms, which open to the living room, are at the far end of the room.  *See* Gov't Exh. 2C.

them Welsh, Boucher and O'Malley) immediately followed the original six-member team into Room 318.  No one knocked on the door of Room 318 before entering.

Upon entering, officers encountered two black males seated on a couch and noted that one bedroom door was open and the second one shut.  The room smelled of burnt marijuana, and marijuana and associated paraphernalia were laid out on a table in the living area.  The door to a kitchen cabinet above the microwave was open.

Wolf and Cooper focused on the closed bedroom door, which in their view posed a safety threat and which they determined was locked from the inside.  Wolf banged on the door, ordering whoever was inside to come out.  An individual opened the door, emerged and was taken into custody. This potential threat having been dissipated, Wolf, whose adrenalin was still pumping, glanced around the room.  He satisfied himself that  officers had encountered and were dealing with all occupants of the room – four in all.  The four were prone on the floor, with officers engaged in the process of patting them down and handcuffing them.  None of the occupants resisted arrest.  Wolf called out, "Who's Rashaun Jones?"  One of the suspects rolled over, looked at him and said, "I'm Rashaun."

Wolf began to assign officers to separate and interview the suspects.  Wolf tasked Boucher, one of his best interviewers, to grab an assistant, move the defendant into a bedroom and interview him there.  Another suspect was moved into the second bedroom, and Wolf set about the task of conducting a brief initial interview of him.  Officers escorted a third suspect across the hall to Room 317, and Cooper moved the fourth suspect into the bathroom, where he was placed prone on the bathroom floor.

The defendant was escorted to his bedroom and seated on his bed.  By then, his hands were handcuffed in front of him.  In the presence of fellow DEA agent Greg Bunch, Boucher read the

defendant his *Miranda* rights verbatim from a standard-issue DEA card, pausing after each right to ask if the defendant understood it and to obtain a verbal response. *See* Gov't Exh. 3.[5] The defendant said "yes" each time and agreed to speak with Boucher. He appeared to Boucher to be very alert and very cooperative. He did not seem to be either nervous or under the influence of drugs or alcohol. He displayed no difficulty understanding Boucher, and Boucher had no difficulty understanding him. Boucher asked him some biographical questions and then queried whether he would mind if officers searched the motel room. Without hesitation, the defendant said yes, they could search. Boucher did not advise the defendant that he could refuse to consent to the search. Nor did he obtain the consent to search in writing. Boucher made no promises or threats to the defendant and heard no one else doing so. After obtaining consent to search, Boucher stepped out of the bedroom and announced that development. Wolf, who observed Boucher emerge from the bedroom and relay this news, advised other team members. Boucher did not participate in the ensuing search. Approximately ten to fifteen minutes elapsed between Boucher's initial entry into Room 318 and his obtaining of consent to search.

After remaining in or near the bathroom a short time, trying to simultaneously monitor the detainee in the bathroom and the scene in Room 318, Cooper decided to move the detainee, who was still prone on the bathroom floor, to the kitchen. He reasoned that this would be both a more comfortable spot for the detainee and an easier vantage from which officers could monitor him than the bathroom floor.

As Cooper began to relocate the detainee, who was handcuffed, he undertook what he termed a "security sweep," aimed at making sure there was no weapon or other object nearby that could be used to hurt anyone. In Cooper's experience, handcuffed individuals have managed to slip out of handcuffs,

---

[5] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478- (*continued on next page*)

hide contraband around their waists and even reach weapons.  Cooper peered into a trash can and opened some kitchen drawers and cabinets that he described as having been within arm's reach of the area where he intended to place a chair.  He noticed, in the cabinet above the microwave, a rice box without a top, as well as some other packages.  He looked into the rice box and saw that it appeared to contain drugs.  He also saw pills in another container on the cabinet shelf.  Given the apparent presence of contraband, he decided not to complete his move of the detainee to the kitchen. He rechecked the bathroom and returned the detainee there, seating him on a closed toilet lid.  He left the rice box where he had found it and informed Thibodeau about it.[6]  He otherwise was unconcerned with detection of drugs.  While the focus of HIDTA task-force members was drug enforcement, the job of the USMS was to apprehend the defendant as safely as possible.

Cooper learned that a consent to search had been given when he mentioned out loud to officers in Room 318 that there was marijuana in plain view, in case they wanted to seek a warrant to search the rest of the room.  One of the officers told him it was okay; officers already had consent to search. Cooper does not recall whether he attempted to relocate the detainee before or after learning that consent to search had been obtained; however, he thinks it would have been afterward because he saw the marijuana upon his entry into the room and would have wanted to mention it to an agent as soon as possible.

Welsh and O'Malley were among those directed to participate in a search of Room 318 based on the consent Boucher had obtained from the defendant.  Welsh focused on the kitchen.  When he reached the open cupboard door above the microwave he noticed, on the top shelf, a clear plastic sandwich bag containing pills that appeared to be Ecstasy.  The cabinet is about six feet off the floor,

---

79.  The form used by Boucher conveys these rights.  *See* Gov't Exh. 3.

[6] Cooper testified that he had informed either Thibodeau or Boucher about the presence of the rice box.  However, Boucher testified unequivocally that he did not learn about the presence of heroin until near the end of the arrest operation, well after he had obtained the *(continued on next page)*

and Welsh was able to see directly into it.  As Welsh was examining the bag of pills, Folan informed him that he had found rice on the kitchen table.  Welsh saw a rice box on the top shelf, pulled it down and looked into it.  He observed that it contained several individual packets of what appeared to be heroin as well as a small box wrapped in Christmas paper.  Welsh informed others in the room of this discovery, placed the items back on the shelf where he had found them and continued his search of the kitchen area.

Well after the consent to search had been given, Wolf learned that heroin had been discovered when someone whispered that fact to him while he was back in Room 317.  Neither Welsh nor Wolf recalls ever discussing the rice box with Cooper.  Well after hearing that consent to search had been given, O'Malley learned that contraband had been found – approximately one hundred bags of heroin and thirty to forty pills of Ecstasy.  At some point, toward the end of the arrest operation, Boucher also learned that heroin had been found.

After Boucher initially questioned the defendant, Wolf also questioned him in the bedroom of Room 318.  Before doing so, he checked with Boucher to ensure that the defendant had been *Mirandized* and had waived his rights.  On at least two occasions the defendant asked for a cigarette, and Wolf left the room to try to find one for him.  Wolf tried to treat the defendant in a professional and courteous manner and felt that the defendant treated him in the same manner.  The defendant never indicated to Wolf that he did not wish to speak with him or wanted an attorney.  The defendant appeared to Wolf to understand the situation, and Wolf's questions, completely.  During the time Wolf was speaking with the defendant, other agents came and went from the bedroom.  For a period of time Cooper joined Wolf there.  Cooper observed that the defendant appeared calm and displayed no hostility.  The defendant appeared more concerned with wanting a cigarette than anything else.

---

defendant's consent to search.  I find that Cooper contemporaneously informed Thibodeau, not Boucher, of his discovery.

In the few seconds officers stood in the hallway waiting to enter Room 318, neither Wolf nor Cooper heard or saw anything to indicate that the room's occupants were aware of the presence of police.  When all was said and done, Wolf's impression was that the occupants learned that police were closing in only when he entered the room with weapon drawn, holding a shield and yelling, "Police!"  No weapons were found in Room 318.

## II.  Discussion

The defendant seeks suppression of items seized from Room 318 on grounds that:

1.      The manner of execution of the warrant violated the so-called "knock and announce" rule.  *See* Motion To Suppress at [2]-[3].

2.      If the defendant consented at all to a search of Room 318, he did not do so freely and voluntarily. *See id*. at [3]-[4].

3.      There is no other justification for the search, *e.g*., that it was incident to a lawful arrest or part of a protective sweep.  *See id*. at [4]-[5].[7]

With respect to the first point, the government bears the burden of proving either compliance with the knock-and-announce rule or applicability of a recognized exception thereto.  *See, e.g., Richards v. Wisconsin*, 520 U.S. 385, 394-95 (1997).  The government agrees that officers did not knock and announce prior to entering Room 318; however, it argues that their conduct was justified by the existence of exigent circumstances.  *See* Government's Objection to Defendant's Motion To Sever and Motion To Suppress Evidence, etc. ("Objection") (Docket No. 46) at 9-14.

With respect to the second two points, the Supreme Court "consistently has held that warrantless searches and seizures in a home violate the Fourth Amendment absent consent or exigent

---

[7] In his moving papers, the defendant noted that he reserved the right to raise an issue regarding asserted lack of administration of a *Miranda* warning if further discovery indicated he had made incriminating statements in response to questions posed by agents.  *See* Motion To Suppress at [2] n.2.  Defense counsel did not raise this point at hearing.  Hence, I deem it to have been waived.

circumstances." *Griffin v. Wisconsin*, 483 U.S. 868, 883 (1987) (Blackmun, J., dissenting). The government bears the burden of demonstrating that at least one of these exceptions pertains. *See, e.g., United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir. 1985) ("The burden of showing exigent circumstances rests upon the government."); *United States v. Esquilin*, 42 F. Supp.2d 20, 27 (D. Me. 1999), *aff'd*, 208 F.3d 315 (1st Cir. 2000) ("[W]hen [the government] seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given.") (citation and internal quotation marks omitted). With respect to these points, the government posits that (i) Cooper's cursory inspection of the kitchen cabinet was part of a legitimate protective sweep performed incident to arrest, (ii) the defendant voluntarily consented to a search of Room 318, legitimating any searches and seizures occurring after the giving of his consent, and (iii) to the extent that Cooper's search occurred prior to the giving of consent and was not justified as part of a protective sweep, the contraband discovered in the kitchen cabinet nonetheless should remain admissible at trial inasmuch as it was also discovered independently pursuant to the consent. *See* Objection at 14-19.

I conclude, and recommend that the court find, that the government has carried its burden of proving that (i) officers justifiably dispensed with knock-and-announce formalities prior to entering Room 318, (ii) the defendant voluntarily consented to a search of Room 318, and (iii) the defendant's consent to search preceded, and thus encompassed, Cooper's search and, in any event, even if Cooper's search preceded the consent, the contents of the cabinet remain admissible pursuant to the so-called "independent source doctrine."

## A.  Knock-and-Announce Rule

As a matter of the Fourth Amendment's general proscription against unreasonable searches and seizures, "[p]olice acting under a warrant usually are required to announce their presence and

purpose, including by knocking, before attempting forcible entry, unless circumstances exist which render such an announcement unreasonable[,]" *United States v. Sargent*, 319 F.3d 4, 8 (1st Cir. 2003).  After knocking and announcing their purpose, officers must wait a reasonable period of time before effectuating a forcible entry.  *See, e.g., United States v. Sherman*, 344 F. Supp.2d 223, 228-29 (D. Me. 2004), *modified on other grounds*, No. CR-04-11-B-W, 2005 WL 757687 (D. Me. 2005). This rule "recognizes the deep privacy and personal integrity interests people have in their homes.  It also serves to protect the safety of police officers by preventing the occupant from taking defensive measures against a perceived unlawful intruder."    *Sargent*, 319 F.3d at 8 (footnote omitted). Nonetheless, the First Circuit has listed four categories of exigent circumstances that excuse non-adherence to the default rule: "1) risk to the lives or health of the investigating officers; 2) risk that the evidence sought will be destroyed; 3) risk that the person sought will escape from the premises; and 4) '[h]ot pursuit' of a fleeing felon." *Sherman*, 344 F. Supp.2d at 232.[8]  The government invokes at least two of these exceptions: potential danger to the officers (and others) and risk of destruction of evidence.  *See* Objection at 14-19.  I conclude that both were present in this case.

As the Supreme Court has observed:

> In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standard – as opposed to a probable-cause requirement – strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.  This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged.

---

[8] As the government suggests, these principles have been codified in a federal statute, 18 U.S.C. § 3109.  *See* Objection at 9 & n.2. Section 3109 provides, in its entirety: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."  18 U.S.C. § 3109.  The Supreme Court has construed this language as codifying the common-law rule and exceptions that inform Fourth Amendment analysis, *see, e.g., United States v. Ramirez*, 523 U.S. 65, 73 (1998), and hence its invocation does not necessitate a separate analysis.

*Richards*, 520 U.S. at 394-95 (citations omitted); *see also, e.g., Sargent*, 319 F.3d at 9 ("The Supreme Court in *Richards* imported the 'reasonable suspicion' test from *Terry v. Ohio*, 392 U.S. 1 [] (1968), which requires that an officer be able to point to specific and articulable facts and have at least a minimal level of objective justification.") (citations and internal quotation marks omitted).  The lawfulness of entry is assessed based upon "what the officers had reason to believe at the time of their entry." *Ker v. California*, 374 U.S. 23, 40-41 n.12 (1963) (emphasis omitted).

While recognizing that felony drug investigations "may frequently involve" both safety and destruction-of-evidence concerns, *see Richards*, 520 U.S. at 391, the Supreme Court in *Richards* declined to carve out a *per se* exception to the default knock-and-announce rules for this category of investigations, ruling that the case-by-case "reasonable suspicion" test must be met, *see id*. at 394-95; *see also, e.g., Sherman*, 344 F. Supp.2d at 232 (observing that, for purposes of exceptions to knock-and-announce rule, the inherent risk that any suspected drug dealer could be violent is not in itself enough to show reasonable suspicion of dangerousness).

Nonetheless, as the First Circuit often has emphasized, the burden of meeting the "reasonable suspicion" test is not onerous.  *See, e.g., United States v. Collazo-Aponte*, 216 F.3d 163, 186 (1st Cir. 2000), *vacated on other grounds*, 532 U.S. 1036 (2001) ("[T]he Supreme Court's standard of reasonableness for Fourth Amendment purposes is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present.") (citation and internal punctuation omitted); *United States v. Hawkins*, 139 F.3d 29, 32 (1st Cir. 1998) ("Although there is a presumption in favor of announcement, i.e., knocking or some similar gesture, this postulate yields under circumstances presenting a threat of physical violence.  The burden that must be met by the police to validate a 'no-knock' entry is not high.") (citations and internal punctuation omitted); *United States v. Jewell*, 60 F.3d 20, 23 (1st Cir. 1995) ("[T]he Federal

14

Constitution does not require state authorities, before they issue a "no-knock" warrant, to have probable cause to believe that entry without knocking is required.  All that is required is that it be reasonable under the circumstances to allow an unannounced entry.").  In my view, the government meets that modest burden in this case.

As an initial matter, the arrest team had probable cause (as evidenced by issuance of the arrest warrant) to believe that the defendant was engaged in the distribution of cocaine base and heroin in the Portland, Maine area.  The arrest team then developed reasonable suspicion, if not probable cause, to believe that the defendant was staying at Room 318 of the Hotel and was engaging in drug trafficking essentially under their noses on the very day of his arrest.  Angela Henry, the Hotel manager, had told O'Malley and Wolf that an individual named Rashaun Jones was staying in Room 318 of the Hotel and that he had behaved suspiciously, using crumpled $100 bills to pay for his room when he had indicated he was going to obtain the money from an ATM.  She showed Wolf a poor copy of the defendant's driver's license.  Wolf thought the individual depicted on the license appeared similar to the defendant as depicted in photographs he had previously seen, to the extent he could remember the details of those photographs.

O'Malley and Wolf then conducted surveillance pursuant to which they observed conduct consistent, in their experience and pursuant to their training, with a drug transaction: the pickup of the male (evidently a courier) by a female driver (evidently a customer), the brief drive to nowhere (during which drugs assumedly were exchanged for cash), the dropoff minutes later of the male at the Hotel parking lot, his return to Room 318 and the ensuing jubilant counting (assumedly of the money).  During oral argument, defense counsel emphasized Wolf's admission that the observed conduct could have been otherwise explainable.  But that is beside the point.  Officers had ample reasonable suspicion to believe that a drug deal was precisely what had just transpired.

15

To add to this mix, officers possessed reasonable articulable suspicion to believe that the defendant was dangerous and possibly armed. The warrant for the defendant's arrest so described him. Beyond this, Wolf, who had participated in the DEA investigation that led to issuance of the warrant, knew that cooperating witnesses and informants had expressed fear of the defendant. When Cooper interviewed the male Hotel occupant in the Shaw's parking lot, the male stated that he did not know whether or not there were weapons in Room 318. In the circumstances, this inconclusive statement hardly could serve to dispel officers' fears. As things turned out, no weapons were found in Room 318, and none of its occupants resisted arrest. However, officers did not and could not know those things prior to their entry. As of that point in time, they had a reasonable factual basis to fear for their safety and the safety of any innocent onlookers. *See, e.g., Sargent*, 319 F.3d at 11 ("[T]here is no requirement that officers serving a search warrant have evidence of the defendant's prior use of violence or even of his particularized propensity for violence in order for exigent circumstances to exist. Such evidence will, of course, make it easier to establish a reasonable suspicion of a threat. But the absence of such evidence does not establish there is no reasonable suspicion of a threat.").

When officers, who already had reason to believe that (i) drugs were present in Room 318, and (ii) the defendant might aggressively resist arrest, detained two of the room's occupants, their concerns understandably were magnified. The two individuals, who had been sent out on a quick cigarette-buying errand, had not promptly returned to Room 318 and were not answering persistent cell-phone calls that officers reasonably assumed were emanating from that room. By the time officers finalized their plans and lined up for entry, enough time had passed to create a real danger that the occupants of Room 318 would have suspected that police were closing in. In that event, the occupants might well have begun preparing to resist arrest and/or destroying evidence of drug trafficking, including the drugs themselves. In those circumstances, for officers to knock and announce their

presence and wait an interval before entry would have increased the potential threat to safety and the potential for destruction of drug-trafficking evidence.  Accordingly, officers reasonably dispensed with such an announcement.[9]  The defendant's bid for suppression of evidence on the basis of a knock-and-announce rule violation should be denied.

## B.  Consent To Search

The defendant next asserts that, to the extent he consented to a search of Room 318, his consent was not voluntarily given.  *See* Motion To Suppress at [3]-[4].  The government carries its burden of demonstrating that he did provide such consent, and it was voluntarily given.

"Valid consent renders a warrantless search constitutionally permissible, and while consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it."  *United States v. Perez-Montañez*, 202 F.3d 434, 438 (1st Cir. 2000).  "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority."  *Id*. (citation and internal quotation marks omitted).[10]  "The district court's conclusion as to whether consent was freely given must take into account the totality of the circumstances surrounding the interaction between the defendant and the authorities."  *Id.*  This interaction, in turn, is measured by a standard of "objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"

---

[9] Defense counsel elicited on cross-examination that neither Wolf nor Cooper heard anything while standing in the hallway outside Room 318 that indicated to them that the occupants of Room 318 were aware of the presence of police.  Wolf also testified that it seemed to him that the occupants learned of a police presence only as he entered the room with shield up and gun drawn, yelling "Police!"  While officers could not have been certain, as they stood outside the door to Room 318 preparing to enter, that the occupants were aware of their presence, they also could not have been certain that the occupants were *unaware* of their presence.

[10] While the question sometimes is framed as one of whether consent has been "freely and voluntarily" given, the concepts are equivalent.  *See, e.g., United States v. Drayton*, 536 U.S. 194, 206 (2002) ("We turn now from the question whether respondents were seized to whether they were subjected to an unreasonable search, *i.e.,* whether their consent to the suspicionless search was involuntary."); *United States v. Chhien*, 266 F.3d 1, 7 (1st Cir. 2001) ("Consent is voluntary if it is the product of an essentially free and unconstrained choice.") (citation and internal quotation marks omitted).

*United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999) (citations and internal quotation marks omitted); *see also, e.g., United States v. Mares*, 428 F.3d 64, 67 (1st Cir. 2005) ("Defendant's final argument is that the officers coerced Mrs. Pérez into consenting to the search of her house. The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.") (citation and internal punctuation omitted).

As a threshold matter, the evidence is uncontroverted that, after advising the defendant of his *Miranda* rights, which the defendant said he understood, Boucher asked if the defendant would mind if the officers searched the motel room, and the defendant stated (without hesitation) that they could.[11] At hearing, defense counsel emphasized that (i) Boucher never told the defendant he could refuse consent, (ii) Boucher made this request shortly after ten or eleven officers rushed into the suite with a protective shield and guns drawn – a tense situation, and (iii) the evidence indicates that the occupants had just indulged in smoking marijuana.  She suggested that, for these reasons, the consent was not valid.

As noted above, the fact that Boucher did not advise the defendant that he had the right to refuse consent is not fatal.  *See, e.g., Perez-Montañez*, 202 F.3d at 438.  While it is true that Boucher's conversation with the defendant transpired moments after the highly charged and tense entry of ten or more officers with a shield and weapons drawn, and it is possible that the defendant might have been smoking marijuana, the government adduced evidence that the defendant appeared calm, cooperative and lucid.  The defendant did not seem, to Boucher, to be under the influence of drugs or

---

[11] On cross-examination of Boucher, defense counsel elicited that (i) the defendant was sitting in his bedroom when asked for consent to search the "motel room," and (ii) Boucher did not clarify which portions of the suite he sought consent to search.  Nonetheless, on redirect examination, counsel for the government elicited that the defendant did not confine his consent to the bedroom.  In seeking consent to search the "motel room," Boucher made it reasonably clear that he sought consent to search the entire suite, not just the bedroom in which the defendant was seated.  From all that appears, the defendant neither sought clarification of Boucher's request or (*continued on next page*)

alcohol.  He understood Boucher, and Boucher understood him.  While Boucher did not advise the defendant he had a right to refuse consent to search, he had just advised him of his *Miranda* rights. Finally, Boucher did not extract the consent by threats or promises; nor did he observe anyone else do so.

Given the totality of the circumstances I conclude, and recommend that the court find, that the defendant voluntarily consented to a search of Room 318, *to wit*, the entire suite.

### C.  Cooper's Discovery of the Contraband in the Cabinet

A loose end remains.  While it is clear that DEA agent Welsh discovered the contraband in the cabinet (the rice box containing heroin and the Ecstasy pills) subsequent to, and in accordance with, the defendant's consent to search, it is also clear that Cooper independently ran across those items as he attempted to move one of his detainees from the bathroom to a chair in the kitchen of Room 318.

As the government suggests, *see* Objection at 19, if Cooper's sweep of the cabinet transpired subsequent to the giving of the consent, it is encompassed and legitimated by that consent, *see, e.g.*, *United States v. Laine*, 270 F.3d 71, 74-75 (1st Cir. 2001) ("The warrant and probable cause requirements of the Fourth Amendment are not absolutes.  One recognized exception is for searches authorized by valid consent.").  The government proves, by a preponderance of the evidence, that Cooper's sweep occurred after that time.  Boucher obtained consent to search fairly quickly after the officers' initial entry.  Cooper was not sure whether he made the sweep before or after consent was given; however, he testified that he believed he did so afterward.  He noted that, upon entering Room 318, he had observed marijuana in plain view.  He recalled calling this to the attention of other officers in case they wanted to seek a search warrant.  Someone then told him that it was okay; officers had received consent to search.

---

indicated that he was consenting only to a search of his bedroom.

In any event, as the government contends, even assuming *arguendo* that Cooper's sweep occurred prior to the giving of consent, the items seized from the cabinet remain admissible pursuant to the independent-source doctrine.  Per this doctrine, "although the government may first learn of certain facts by illegal means, it may nevertheless prove those facts at trial if it later learns of them by independent, legal means."  *United States v. Scott*, 270 F.3d 30, 44 (1st Cir. 2001).[12]  That is precisely what transpired here.  Cooper came across the contraband as he made a protective sweep. He testified that he informed either Thibodeau or Boucher of his finding; however, Boucher testified unequivocally that he did not learn of the discovery of the heroin until toward the end of the arrest operation, well after the consent was given.  I am satisfied that the government has shown that, at the time Boucher was obtaining the defendant's consent to search, neither Boucher nor the defendant was aware that Cooper had viewed the contraband in the cabinet, and Boucher was at that time also unaware that there was any contraband hidden in the cabinet.

As I have already found, the defendant voluntarily consented to a search of Room 318.  His consent was not coerced or otherwise tainted by any finding by Cooper of the contraband.  Further, the government has demonstrated that Welsh, who found the contraband in searching the kitchen pursuant to the defendant's consent, had no knowledge of Cooper's discovery.  In short, Cooper's viewing of the contraband was something of a tree falling in a forest: It had no impact on either the obtaining of the defendant's consent or the search conducted pursuant to that consent.  The evidence seized from the cabinet accordingly should not be suppressed.  *See, e.g., Murray v. United States*, 487 U.S. 533, 541 (1988) ("Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry.  But it was also acquired at the time of entry pursuant to the warrant, and if that

---

[12] The "independent source" and "inevitable discovery" doctrines are related but distinguishable.  "In the former, evidence that is come at lawfully from a source independent of the taint of illegal conduct is deemed admissible.  Under the latter, evidence that is discovered through unlawful conduct, but would inevitably be discovered by other means, is rendered admissible."  *United States v. Pena*, 924 (*continued on next page*)

later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply.  Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one.") (emphasis in original); *Scott*, 270 F.3d at 44-45 ("The question in independent source cases is one of causation; suppression requires at least a finding that the challenged evidence would not have been obtained but for a constitutional violation as to the defendant in the case at issue."); *United States v. Dickson*, 64 F.3d 409, 411 (8th Cir. 1995) (in circumstances in which woman's consent to search apartment was "an independent act, causally unconnected to the [earlier, unlawful] actions of the police in trying the keys in the apartment door and entering the apartment[,]" the voluntary consent made lawful the search that revealed guns and money).

### III.  Conclusion

For the foregoing reasons, I recommend that the findings of fact proposed herein be **ADOPTED** and the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 24th day of March, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

---

F. Supp. 1239, 1253-54 n.8 (D. Mass. 1996).